IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>LEENA JAITLEY, D/B/A MANAGED OPTIONS TRADING and OPTIONS BY PROS,<br><br>Defendant,<br><br>and<br><br>TARABEN PATEL and OTA LLC,<br><br>Relief Defendants. | Civil No. 1:21-cv-832 |

# COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC" or the "Commission"), alleges as follows:

## SUMMARY

1. From at least 2018 to the present, Leena Jaitley (a.k.a. Ali Jaitley and Leena Patel) ("Jaitley"), doing business as OptionsbyPros ("OBP") and Managed Option Trading ("MOT"), two websites that she created and operated in the names of OBP and MOT that purported to profitably trade stock options on behalf of their clients, has engaged in a fraudulent scheme to defraud investors.

2. Through the OBP and MOT websites, Jaitley offered a service through which clients could provide OBP and MOT with access to their on-line securities brokerage accounts

and authorize traders purportedly employed by the websites to trade stock options on their behalf.

3. In order to convince investors to subscribe for the service, Jaitley falsely claimed, among other things, that OBP and MOT (a) used a unique, proprietary trading system designed to generate profits, (b) had a long track record of successful investing, and (c) employed scores of traders in New York with experience at large and reputable broker-dealers. Jaitley also created, solicited, and/or published on-line, including on the OBP and MOT websites, glowing testimonials and positive reviews by supposed clients of the websites.

4. In reality, however, the only "traders" at OBP and MOT were Jaitley and, possibly, Jaitley's now-deceased father, a former engineer who, at the time of the scheme, was 84-years old, in poor health, and may have been suffering from dementia. They operated out of their homes in Austin, Texas, not New York. Neither had any unique, proprietary trading system that would reliably produce profits; a history of successful options trading; or any relevant education, training, or professional experience. And some, if not all, of the positive reviews and testimonials posted on the OBP and MOT websites were false and fabricated by Jaitley.

5. Although Jaitley, through OBP and MOT, initially made money for certain clients, ultimately, both entities frequently lost all or most of the money in their clients' accounts through volatile, high risk, and ultimately unprofitable trades. When clients complained about their trading losses, Jaitley, using an alias and posing as a representative of OBP or MOT, often responded by email or text message to falsely disavow any responsibility and blamed the client or someone else for her own losing trades.

6. Jaitley's trading resulted in at least fifteen individuals ("the Clients") losing investment principal of approximately $808,000. In addition, the Clients paid approximately

$525,000 in "start-up" and other fees to MOT and OBP, and one client paid approximately $150,000 to OBP after being convinced to do so in a purported effort to recover his trading losses. In total, the Clients lost approximately $1.48 million by retaining MOT and OBP's services.

7. By engaging in this fraud, the Defendant violated the anti-fraud provisions of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77a, *et seq.*], the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78a, *et seq.*], and the Investment Advisers Act of 1940 ("Advisers Act) [15 U.S.C. § 80b-1, *et seq.*], as set forth in more detail below.

8. In the interest of protecting the public from any further fraudulent activity and harm, the Commission brings this action against the Defendant and the Relief Defendants variously seeking: (i) permanent injunctive relief; (ii) disgorgement of ill-gotten gains; (iii) accrued prejudgment interest on those ill-gotten gains; and (iv) civil monetary penalties.

## JURISDICTION AND VENUE

9. The Court has jurisdiction over this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78(aa)].

10. Venue is proper because a substantial part of the events or omissions giving rise to the claims occurred within the Western District of Texas, Austin Division. Further, upon information and belief, the Defendant currently resides in Austin, Texas, and she resided there at all relevant times. Relief Defendant Taraben Patel also resides in Austin, Texas, and she has resided there at all relevant times. Relief Defendant OTA LLC's principal place of business is in Austin, Texas.

11. In connection with the transaction, acts, practices, and courses of business described in this Complaint, Defendant, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, of the facilities of a national securities exchange, and the means and instruments of transportation or communication in interstate commerce. For example, in effecting the fraudulent misconduct described herein, Jaitley made false statements via the Internet and through interstate telephone calls and text messages, and she accessed the Clients' securities accounts using the Internet.

## DEFENDANT

12. **Leena Jaitley** (a.k.a. Ali Jaitley and Leena Patel), d/b/a as Managed Options Trading and Options by Pros, age 47, resides in Austin, Texas. Upon information and belief, Jaitley has been arrested multiple times, including for stalking, harassment, and DUI/DWI, and has been convicted of various felonies, including counterfeiting/forgery of financial instrument, theft, tampering with government records/fraud, and "online impersonation-name/persona."

## RELIEF DEFENDANTS

13. **Taraben Patel**, age 77, is Jaitley's mother and resides in Austin Texas. She is a citizen of India and previously worked as a clerk for the Internal Revenue Service.

14. **OTA LLC**, is a New Mexico Limited Liability company. Its principal place of business is in Austin, Texas. Jaitley directs and controls OTA LLC's, and is its organizer and sole member.

## STATEMENT OF FACTS

I.   **The Fraudulent Websites.**

15. In or around June 2018, Jaitley began operating a website in the name of OBP that offered options trading services to investors.

16. The OBP website advertised two services: an "option trade alert" service and a "managed account trading" service. With the "option trade alert" service, OBP offered, for a fee, to send subscribers special "alerts" — such as "market moving news, momentum stocks, earnings, upgrades/downgrades, [and] charts/technical analysis" — via email or live chat.

17. OBP's website promised that the service would "make [subscribers] thousands." The website claimed that OBP "find[s] profitable option trade alerts before other traders. Guaranteed." The website also claimed that OBP had a "30+ year track record" and a "lifetime winning history of better than 82% of Goldman Sachs [sic]." It also claimed that OBP used a "unique, proprietary technical analysis system designed to deliver consistent profits," and that the firm's physical address was 200 Park Avenue, New York, NY, which is the address of the MetLife Building in Manhattan.

18. Just about all of these representations about OBP were false. OBP did not have a "30+ year track record." Jaitley formed OBP in 2018. Jaitley operated OBP out of her home in Austin Texas, not at the MetLife Building, and she did not use a unique, proprietary technical analysis system. In addition, based on trading records, Jaitley's trading in client accounts overwhelmingly resulted in losses, not a "winning history."

19. Clients who wanted to use OBP's "managed account trading" service were directed to open an online options trading brokerage account and to authorize OBP to trade in the account on the Client's behalf.

20. Jaitley began operating her other trading service, MOT, in or around July 2019, describing it as a "managed account trading" service like OBP. MOT's website advertised, "We Trade for You," and it claimed that MOT used "full time, experienced option traders" and had an "average winning history of better than 78%" with a "stellar 16+ year track record."

21. Once again, these statements were false. Jaitley did not employ full time experienced options traders. She, and perhaps her now-deceased father under her direction, were the only traders. Moreover, Jaitley and MOT had no "stellar 16+ year track record" of trading in options. Jaitley formed MOT in 2018 and began trading in 2019, and her options trading strategies were not successful, resulting in more than $800,000 in trading losses in her Clients' accounts.

22. The OBP website also featured numerous "testimonials" from supposed Clients and a list of supposedly profitable trades. One purported client claimed that he had made $1.5 million in just three months from OBP's managed account service. Another purportedly claimed that OBP had doubled the value of his account in three weeks. Client account records do not support these testimonials.

23. Other reviews from supposed clients of OBP and MOT, claiming that they had made hundreds of thousands of dollars from these services, were posted on the third party ratings website, Sitejabber. One purported client posting on Sitejabber stated that in deciding to begin doing business with OBP, he or she relied on OBP's "incredible reputation."

24. Some, if not all, of these reviews and testimonials were bogus and fabricated, directly or indirectly, by Jaitley. In one instance, Jaitley solicited an acquaintance to write and post testimonials on the websites even though, in reality, he had never used the OBP or MOT services. When asked by the Commission staff during sworn investigative testimony whether she had drafted the testimonials or asked someone else to do so, Jaitley refused to answer based on her Fifth Amendment privilege against self-incrimination.

25. Throughout the period of the scheme, although purporting to act through others, including aliases and family members, it was Jaitley who made the above-described material

misrepresentations to her Clients with respect to the background, experience, and trading activities of OBP and MOT. It was Jaitley who had unfettered discretion to trade on the Clients' behalf. And it was Jaitley who executed and directed the execution of trades in the Clients' accounts.

26. Although Jaitley held out her mother, Taraben Patel, as the person primarily associated with OBP and MOT, Jaitley was the individual who directed, controlled, and operated OBP and MOT, including by (a) operating the OBP and MOT websites, (b) communicating with Clients, (c) misrepresenting the performance and background of OBP and MOT, (d) convincing the Clients to provide access to their brokerage accounts, (e) receiving and controlling payments from investors; (f) making trades in Clients' accounts, and (g) when their money was lost, disclaiming responsibility for the losing trades.

27. Similarly, although Jaitley's now-deceased father may have engaged in some of the trading in Clients' accounts, at all times he acted under the supervision, direction, and/or control of Jaitley.

## II. Jaitley Made Material Misrepresentations to the Clients in Connection with the Trading of Options.

28. Several of the Clients first became involved with OBP or MOT by participating in internet chat discussions with purported representatives of the firms. When Clients expressed an interest in the firms' "managed account trading" services, Jaitley, using an alias and purporting to be a sales representative for OBP or MOT, emailed, called, or used chat services to explain to Clients in detail how the service worked.

29. Specifically, when communicating with one or more of the Clients, Jaitley falsely claimed, among other things, that:

    a. OBP employed dozens of traders, including former Goldman Sachs and JP Morgan traders;

    b. the owner of OBP and MOT had been engaged in trading options since at least 2008;

    c. OBP had about 500 clients;

    d. OBP had an office in New York, and that "all of [OBP's] traders" worked in that office because they needed to be "close to the exchange";

    e. OBP and MOT had strong track records of successfully making significant profits for their clients and expected to make the Clients a specified minimum amount of profit (e.g., $20,000 minimum weekly profit on a $100,000 account; $50,000 minimum weekly profit on a $200,000 account) and guaranteed to make any lost money back. Purported OBP and MOT traders claimed to have taken accounts from "100K to 255k in 3 days," "10k to 1.9 mill," "60K to 400K," and "100K to 700."

30. Jaitley, still posing as an OBP or MOT representative, then directed the Client to open an on-line brokerage account and to fund the account with $50,000 - $200,000, and then either (a) provide OBP or MOT with the username and password for the account so that OBP or MOT traders could access and conduct trades in those brokerage accounts on the Clients' behalf, or (b) designate MOT or OBP as an authorized trader on the account.

31. From 2018 to 2020, approximately fifteen Clients deposited approximately $570,000 into one of two bank accounts in "start-up" and other fees: one in Taraben Patel's name, and one jointly in the name of Taraben Patel and a Taraben Patel sole proprietorship, d/b/a OptionsPros. Jaitley directed payment to these accounts and subsequently transferred substantial

amounts of these Client funds to bank accounts over which Jaitley, or her company, Relief Defendant OTA LLC, exercised exclusive control. Jaitley then withdrew large sums of money from those accounts.

32. Jaitley, through OBP and MOT, exercised discretion over the selection, purchase, and sale of options in the Clients' accounts, and she had unrestricted discretion to buy or sell securities on behalf of the Clients.

33. Although the specific amounts varied by Client, Jaitley also asked the Clients to pay (a) a "start-up fee" of about $2,500, (b) a "performance fee" of around thirty percent of all "profits" generated by OBP and MOT, and (c) a "termination fee" of about $3,500 - $4,000, payable if the Clients cancelled the arrangement without providing five business days' notice.

34. Although the details differed from Client to Client, what transpired next generally followed a typical fact pattern.

35. Jaitley often required the Clients to sign written agreements obligating them to wire thirty percent of any profits (a "performance fee") every week to a bank account specified by OBP or MOT.

36. In some cases, OBP and MOT initially made money for the Client by purchasing and selling small amounts of options in the Client's brokerage account.

37. However, typically within a few days, OBP and MOT would begin executing large trades in the Clients' accounts that often resulted in large losses that both wiped out any gains that previously had been generated *and* resulted in the account losing most or all of the money that the Client had originally deposited in the account to fund the trading by OBP and MOT.

38. Nearly all of the Clients suffered significant net losses in their accounts as a result of the often high risk trades and volatile trading strategies that Jaitley employed.

39. When Clients emailed OBP and MOT to ask why their accounts suddenly had suffered large losses, Jaitley, using an alias and posing as a representative of OBP or MOT, typically would reply and claim to have no knowledge of the trades that had caused the losses, and either accuse the Clients of causing the losses themselves or insist that the accounts had been hacked or accessed by someone else.

40. In at least one instance, when a Client attempted to stem the losses by changing his password to prevent OBP from accessing his account, Jaitley accused the Client of violating their agreement, demanded that the Client pay a $3,500 termination fee, and threatened legal action against the Client. Several of the Clients paid the termination fee.

41. In other instances, OBP and MOT never generated any profits in certain Clients' accounts because Jaitley immediately placed very large trades that caused the accounts to lose all or most of their value. When the Clients inquired about the unusual trades and large losses, Jaitley typically responded that the traders knew what they were doing and that the losses were only "paper losses." The Clients then changed their passwords to prevent OBP or MOT from accessing their accounts again, and they never recovered their losses.

42. The experiences of one Client ("Client A") illustrate the knowing, active, and brazen efforts of deception employed by Jaitley to conceal and further her scheme. In early 2019, OBP lost more than $250,000 in Client A's brokerage account by trading options. In addition, Client A paid more than $150,000 in various start-up fees to OBP.

43. Jaitley, holding herself out as a representative of OBP named "David," contacted Client A by text message and claimed to be working with the SEC to recover Client A's money.

44.     "David" convinced Client A to pay certain "application fees" and, in addition, directed Client A to purchase various gift cards, and instructed Client A to send the gift cards to Jaitley and Taraben Patel (Jaitley's mother and a Relief Defendant herein) purportedly in order to "verify" his identity.

45.     "David" also persuaded Client A to lease a BMW, put Jaitley's name on the insurance policy, and have the car sent to Austin, Texas for Jaitley's use.  "David" further asked Client A to purchase various luxury goods and send them to Taraben Patel or Jaitley.

46.     Client A spent approximately $150,000 on these additional items purportedly to assist OBP in recovering his trading losses.

47.     During her sworn investigative testimony before the Commission staff, Jaitley, who was represented by counsel, refused to answer almost all substantive questions regarding her involvement with OBP and MOT based on her Fifth Amendment privilege against self-incrimination, including questions concerning her options trading in the Clients' accounts; her knowledge of, and communications with, the Clients; reviews and testimonials of purported OBP and MOT clients; her access to email accounts used to communicate with the Clients; her access to the bank accounts where Client payments were deposited; her misrepresentations and false statements to the Clients; and the potential destruction of evidence.

### III.     Jaitley Acted as an Investment Adviser

48.     By the above-described conduct and actions taken on and behalf of OBP and MOT, Jaitley performed investment advisory services, and acted as an investment adviser to her Clients.

49. By exercising discretionary control over the Clients' securities accounts and determining which options to trade on the Clients' behalf, Jaitley, using the trade names OBP and MOT, provided investment advice.

50. Jaitley also represented to the Clients that she would appoint professional traders to trade options in Client's brokerage accounts, and she may have selected and used her father to conduct trades on behalf of the Clients that she recruited. She also monitored the Clients' accounts and reported periodically to the Clients on the performance of the trades.

51. Jaitley was compensated for her services in the form of start-up fees and a share of the trading profits.

52. By the misconduct alleged herein, Jaitley violated the fiduciary duties of utmost good faith and full disclosure that she owed to her Clients.

IV. **The Relief Defendants Received Proceeds of the Fraud Subject to Disgorgement**

53. At relevant times, Relief Defendants Taraben Patel and OTA LLC received and obtained investor funds and benefitted from the use of these funds, which are proceeds of the unlawful activity alleged above.

54. Taraben Patel and OTA LLC gave no bona fide consideration for these funds, and otherwise have no legitimate claims to such funds received, and these funds are therefore subject to disgorgement.

**FIRST CLAIM FOR RELIEF**

**Violations of the Antifraud Provisions of the Securities Act
Section 17(a) [15 U.S.C. § 77q(a)]**

[against Defendant Leena Jaitley]

55. The Commission repeats and re-alleges Paragraphs 1 through 54 of this Complaint, as if fully set forth herein.

56. By engaging in the acts and conduct alleged above, Jaitley, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, (1) knowingly or recklessly employed devices, schemes, or artifices to defraud; (2) with negligence, obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and (3) with negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers, in violation of Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2) and (3)].

57. By engaging in this conduct, Jaitley violated, and unless enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

**Violations of Antifraud Provisions of the Exchange Act
Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5]**

[against Defendant Leena Jaitley]

58. The Commission repeats and re-alleges Paragraphs 1 through 57 of this Complaint, as if fully set forth herein.

59. By engaging in the foregoing misconduct, Jaitley, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices,

and courses of business which operate as a fraud or deceit upon persons, including purchasers or sellers of securities.

60. Jaitley engaged in the above-referenced conduct knowingly or with severe recklessness.

61. By engaging in this conduct, Jaitley violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF

**Violations of the Antifraud Provisions of the Advisers Act
Section 206(1) [15 U.S.C. § 80b-6(1)]**

[against Defendant Leena Jaitley]

62. The Commission repeats and re-alleges Paragraphs 1 through 61 of this Complaint, as if fully set forth herein.

63. By engaging in the acts and conduct alleged in this Complaint, Jaitley was acting as an investment adviser to the Clients within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11), because she was a person who, for compensation, engaged in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

64. By engaging in the acts and conduct alleged in this Complaint, Jaitley, directly or indirectly, with scienter, by use of the mails or means and instrumentalities of interstate commerce, while acting as an investment adviser, employed devices, schemes, or artifices to defraud any client or prospective client.

65. As an investment adviser, Jaitley owed and owes the Clients a fiduciary duty of utmost good faith and had an affirmative duty to make full and fair disclosure to them of all

material facts, as well as the duty to act in the Clients' best interests, and not act in Jaitley's own interests to the detriment of the Clients.

66. Jaitley breached her fiduciary duties to the Clients and engaged in fraudulent conduct that violated Section 206(1) of the Advisers Act, 15 U.S.C. § 80b-6(1).

67. By reason of the foregoing, Jaitley violated, and unless enjoined will again violate, Section 206(1) of the Advisers Act, 15 U.S.C. § 80b-6(1).

### FOURTH CLAIM FOR RELIEF

**Violations of the Antifraud Provisions of the Advisers Act
Section 206(2) [15 U.S.C. § 80b-6(2)]**

[against Defendant Leena Jaitley]

68. The Commission repeats and re-alleges Paragraphs 1 through 67 of this Complaint, as if fully set forth herein.

69. By engaging in the acts and conduct alleged in this Complaint, Jaitley was acting as an investment adviser to the Clients within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11), because she was a person who, for compensation, engaged in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

70. By engaging in the acts and conduct alleged in this Complaint, Jaitley, directly or indirectly, by use of the mails or means and instrumentalities of interstate commerce, while acting as an investment adviser, engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon any client or prospective client.

71. As an investment adviser, Jaitley owed and owes the Clients a fiduciary duty of utmost good faith and had an affirmative duty to make full and fair disclosure to them of all material facts, as well as the duty to act in the Clients' best interests, and not act in Jaitley's own

interests to the detriment of the Clients.

72. Jaitley breached her fiduciary duties to the Clients and engaged in fraudulent conduct that violated Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2).

73. By reason of the foregoing, Jaitley violated, and unless enjoined will again violate, Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2).

## FIFTH CLAIM FOR RELIEF

### Equitable claim against Relief Defendants

[against Relief Defendants Taraben Patel and OTA LLC]

74. The Commission repeats and re-alleges Paragraphs 1 through 73 of this Complaint, as if fully set forth herein.

75. Taraben Patel and OTA LLC, directly or indirectly, received funds or benefitted from the use of funds, which are proceeds of the unlawful activity alleged above. They obtained funds and property, directly or indirectly, from Jaitley that were obtained by her as a result of the securities law violations described herein.

76. Patel and OTA LLC have no legitimate claims to such funds received, or from which they otherwise benefitted, directly or indirectly.

77. As a result of the conduct described above, Relief Defendants Patel and OTA LLC should be ordered to disgorge their ill-gotten gains, plus prejudgment interest thereon.

## PRAYER FOR RELIEF

For these reasons, the Commission respectfully asks the Court to enter a final judgment:

1. permanently enjoining Defendant from violating Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Section 206 of the Advisers Act;

2. ordering Defendant and Relief Defendants to disgorge all ill-gotten gains according to proof, with prejudgment interest, derived from the conduct alleged in

this Complaint, pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

3. ordering Defendant to pay civil monetary penalties pursuant to Section 20 of the Securities Act [15 U.S.C. § 77t], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9]; and

4. granting such additional relief as the Court deems just, appropriate, and equitable.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury in this action of all issues so triable.

Respectfully submitted,

Paul W. Kisslinger
SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, DC 20549
(202) 551-4427
*KisslingerP@sec.gov*

Of Counsel:
Jennifer S. Leete
Yuri B. Zelinsky
Greg Hillson
Christian J. Ascunce

ATTORNEY FOR PLAINTIFF

DATED: September 20, 2021